**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**JAMES M.,**[1]

**Plaintiff,**

**v.**

**Case No. 3:20-cv-303**
**Magistrate Judge Norah McCann King**

**COMMISSIONER OF SOCIAL SECURITY,**[2]

**Defendant.**

**OPINION AND ORDER**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff James M. for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq*. Plaintiff appeals from the final decision of the Commissioner of Social Security denying that application. This matter is now before the Court, with the consent of the parties*, see Joint Consent of the Parties*, ECF No. 5, on *Plaintiff's Statement of Errors*, ECF No. 13, *Defendant's Memorandum in Opposition*, ECF No. 14, *Plaintiff's Reply*, ECF No. 15, and the *Certified Administrative Record*, ECF No. 9. After careful consideration of the entire record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court denies *Plaintiff's Statement of Errors* and affirms the Commissioner's decision.

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* S.D. Ohio General Order 22-01.
[2] Kilolo Kijakazi is the Acting Commissioner of Social Security. *See* Fed. R. Civ. P. 25(d).

## I. PROCEDURAL HISTORY

On February 14, 2017, Plaintiff protectively filed his application for benefits, alleging that he has been disabled since June 1, 2014, due to both physical and mental impairments. R. 198-204.[3] The application was denied initially and upon reconsideration, and Plaintiff sought a *de novo* hearing before an administrative law judge. R. 128-30. Administrative Law Judge ("ALJ") Gregory G. Kenyon held a hearing on March 19, 2019, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. R. R. 45-79. In a decision dated July 2, 2019, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from the date on which the application was filed through the date of that decision. R. 10-30. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on May 28, 2020. R. 1-6. Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On March 23, 2022, the case was reassigned to the undersigned. ECF No. 17. The matter is ripe for disposition.

## II. LEGAL STANDARD

### A. Standard of Review

In reviewing applications for Social Security disability benefits, "[t]he Commissioner's conclusion will be affirmed absent a determination that the ALJ failed to apply the correct legal standard or made fact findings unsupported by substantial evidence in the record." *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). The United States Supreme Court has explained the

[3] The Court will refer to pages in the Certified Administrative Record as "R. __," using the pagination as it appears in the Certified Administrative Record.

substantial evidence standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means–and means only–such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted). In addition, "'[w]here substantial evidence supports the [Commissioner's] determination, it is conclusive, even if substantial evidence also supports the opposite conclusion.'" *Emard v. Comm'r of Soc. Sec*., 953 F.3d 844, 849 (6th Cir. 2020) (quoting *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990)); *see also Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399, 406 (6th Cir. 2009) ("Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). "Yet, even if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2007)).

**B. Sequential Evaluation Process**

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. § 416.920(a)(4). "The claimant bears the burden of proof through step four; at step five, the burden

shifts to the Commissioner." *Rabbers*, 582 F.3d at 652 (*citing Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. § 416.920(b). If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 416.920(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 416.920(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. at § 416.909. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 416.920(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 416.920(g). If the ALJ determines that the plaintiff can do so,

then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III. ALJ DECISION AND APPELLATE ISSUES

The Plaintiff was 38 years old on the application date, February 14, 2017. R. 29. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since that date. R. 12.

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: residuals of a gunshot wound to the right lower extremity and abdomen, degenerative joint disease of the left shoulder, residuals of a right thumb injury, degenerative joint disease of the left knee, mild left ankle arthritis, obesity, bipolar disorder, posttraumatic stress disorder ("PTSD"), and borderline intellectual functioning. R. 12. The ALJ also found that Plaintiff's diagnosed hypertension was not severe. R. 13.

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 13.

At step four, the ALJ found that Plaintiff had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he is limited to occasional crouching, crawling, kneeling, stooping, and climbing of ramps and stairs with no climbing of ladders, ropes, and scaffolds. The claimant is limited to no work around hazards such as unprotected heights or dangerous machinery. He is only able to occasionally use the left upper extremity for overhead reaching and frequent use of the right upper extremity for handling and fingering. The claimant is limited to performing unskilled, simple, repetitive tasks with no fast-paced production work or jobs involving strict production quotas. The claimant is limited to occasional, superficial contact with coworkers and supervisors with "superficial contact" defined as retaining the ability to receive simple instructions, ask simple questions, and receive performance appraisals but as lacking the ability to engage in more complex social interactions such as persuading other people or resolving

> interpersonal contacts. The claimant is further limited to no public contact and jobs that involve very little, if any, change in the job duties or the work routine from one day to the next.

R. 15-16. The ALJ also found that Plaintiff has no past relevant work. R. 28.

At step five, and relying on the testimony of the vocational expert, the ALJ found that, considering Plaintiff's vocational profile and RFC, there are a significant number of jobs in the national economy that he can perform, including such jobs as merchandise marker, routing clerk, and photocopy machine operator. R. 29. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from the application date through the date of the decision. R. 30.

Plaintiff disagrees with the ALJ's findings at steps four and five, and specifically argues that the ALJ erred in evaluating the medical source opinions and medical record, and failed to carry the Commissioner's burden at step five. *Plaintiff's Statement of Errors*, ECF No. 13.[4] He asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits or, alternatively, for further proceedings *Plaintiff's Statement of Errors,* ECF No. 13; *Plaintiff's Reply*, ECF No. 15. The Acting Commissioner takes the position that her decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief,* ECF No. 14.

## IV. RELEVANT EVIDENCE

Plaintiff testified at the administrative hearing that he suffered a gunshot wound to the leg and abdomen, which has left him with pain, nausea, and diarrhea. R. 54-56. As a result of an

[4] Plaintiff's step five is in essence a challenge to the ALJ's RFC determination at step four. The Court will address Plaintiff's contentions within that context.

injury to the left knee, he experiences swelling and pain, and the knee gives out with standing or walking "for a very long period of time." R. 58. He estimates that he can stand for only five or ten minutes. R. 71. He cannot lift his left arm very high because of a shoulder injury, for which he underwent physical therapy and takes pain medication. R. 59. He has also undergone surgery on his right hand and thumb, but can no longer feel his fingertip and cannot use his right thumb. R. 59-61. He cannot lift 20 pounds. R. 72. He also suffers on a daily basis from the effects of bipolar disorder. "I shut down when I get upset. If I feel myself getting upset, I just go to myself." R. 62. He has difficulty concentrating, and has nightmares on a weekly basis. R. 63-64. He has daily auditory hallucinations. R. 65-66. He also experiences panic attacks and crying spells on a daily basis. R. 69. His medication causes him to "nod in and out all the time," R. 68, but does not completely alleviate his symptoms. R. 71. He lives with his mother; his mother and his girlfriend sometimes help with his personal care. R. 67. His children visit every week, R. 70, and his former girlfriend takes him out to eat on a weekly basis. R. 68. Otherwise, he stays in his residence. *Id*.

**A. Evidence relating to Plaintiff's Physical Impairments**

Plaintiff has been treated for left knee pain and instability and for an injury to the right thumb. R. 394-435. An MRI of the left knee showed early degenerative change, R. 412, 433, for which Plaintiff underwent a cortisone injection in December 2014. R. 409, 412. In that same month, Michael Raab, M.D., an orthopedic surgeon, performed a right thumb ulnar collateral ligament reconstruction and pinning. R. 405, 419. On follow-up, Plaintiff had "no complaints," and reported mild to moderate intermittent pain that was "controlled." R. 417. There was no numbness or tingling. *Id*. In January 2015, Dr. Raab reported to the Ohio Department of Job and Family Services that Plaintiff's knee and right thumb conditions did not affect his ability to

stand, walk, or sit, but that he could lift and carry no weight. R. 495. He was extremely limited in his ability to push, pull and handle, but other functions were not affected. *Id*. The hardware was removed from the thumb the following month and, on follow-up, range of motion was "near full," and strength was intact. R. 423. Plaintiff still complained of pain and numbness, although narcotic pain medication was discontinued. R. 423, 425.

In April 2016, Plaintiff was hospitalized with a gunshot wound to the right lower extremity and abdomen. R. 279-338. He underwent surgery and was discharged "in good condition." R. 283.

In April 2017, Plaintiff underwent a consultative physical examination by Amita Oza, M.D., on behalf of the state agency. R. 346-52. Plaintiff was characterized as morbidly obese. R. 347. He was alert and oriented. *Id*. On examination, grip strength was "pretty good," range of motion at the right shoulder was "[s]lightly" restricted with complaints of pain, and there was almost full range of motion at the knees. R. 348. Muscle testing was normal, R. 349, and there was decreased range of motion at the right shoulder, the dorsolumbar spine, and the left ankle. R. 350-52. According to Dr. Oza, "he should be able to perform sedentary to light work where he is not standing or walking for more than 20 minutes. Sitting is okay, but it is currently his psychiatric problem that is prevent him from working." *Id.*

That same month, Maureen Gallagher, D.O., reviewed the evidence of record on behalf of the state agency and concluded that Plaintiff had "no severe physical limitations." R. 87. "The [claimant] has full strength and good [range of motion] except for back flexion which is limited because of 'morbid' obesity." *Id*. In September 2017, Diane Manos, M.D., reviewed the record on reconsideration and agreed that the "evidence does not support a severe physical impairment at this time." R. 103.

In February 2019, Plaintiff saw Dr. Raab for complaints of left shoulder pain. R. 535. Dr. Raab diagnosed rotator cuff tendinitis, AC joint arthritis and biceps tendinitis, with suspected chronic rotator cuff tear. R. 539. He referred Plaintiff to physical therapy. R. 539. *See also* R. 524-34 (Physical therapy records).

Kwasi A. Nenonene, M.D., is Plaintiff's primary care physician. On February 18, 2019, Dr. Nenonene provided an assessment of Plaintiff's ability to do work-related activities. R. 542-46. Plaintiff's conditions consisted of paravertebral muscle spasm and "diffused" joint pain. R. 542. As a result of his joint pain, Plaintiff could lift and carry no more than ten pounds occasionally could stand/walk, and sit, no more than two hours total each in an eight hour work day, for only one hour at a time, R. 543, and his ability to reach and push/pull would be affected, R. 544. As a result of the paravertebral muscle spasm, Plaintiff could only occasionally climb, balance, stoop, crouch, kneel, and crawl. *Id.* He should not work around heights, moving machinery, temperature extremes, or vibration. R. 545. Dr. Nenonene responded "YES" to questions asking if Plaintiff had the RFC to perform sedentary and light work on a sustained basis. R. 545-46. On March 7, 2019, however, Dr. Nenonene crossed out that response and circled "NO" in response to those questions. R. 551-52.

**B. Evidence relating to Plaintiff's Mental Impairments**

In May 2017, Plaintiff underwent a consultative psychological examination, upon referral by the state agency, by Richard E. Sexton, Ph.D. R. 371-79. Plaintiff's mood was depressed and anxious and his affect was flat. R. 375. He denied panic attacks. *Id*. Dr. Sexton estimated that Plaintiff's level of intelligence fell at the upper end of the borderline range; there was slight impairment in attention. R. 376. He "established a fair relationship with the examiner." R. 378. Plaintiff appeared to be suffering from an unspecified bipolar and related disorder. R. 377. In an

assessment of Plaintiff's ability to function in the work setting, Dr. Sexton indicated that Plaintiff could understand and apply instructions consistent with borderline intellectual functioning, "performance concerns by others are not to be expected," there were "[s]ome limitations in his ability to conform to social expectations," and Plaintiff would be "expected to respond appropriately to work place pressures." R. 378-79.

In May 2017, Joseph Edwards, Ph.D., found on initial review of the record that Plaintiff suffers from depressive, bipolar and related disorders, substance addiction disorders, and borderline intellectual functioning. R. 87. Dr. Edwards opined that Plaintiff was moderately impaired in his abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. R. 88. Dr. Edwards characterized his opinion as less restrictive than Dr. Sexton's, but explained that the latter's opinion "is without substantial support from the medical source who made it, which renders it less persuasive." R. 92. In August 2017, Karen Terry, Ph.D., reviewed the record for the state agency on reconsideration and agreed with Dr. Edwards' assessment on initial review, R. 104-10, including the assessment that Dr. Sexton's opinion "is not well supported or consistent with other evidence in file. R. 106.

The record includes evidence of psychiatric treatment by Ramakrishna Gollamudi, M.D., beginning in March 2017. R. 380-93. *See also* R. 502-20 (duplicate records). Diagnoses on initial evaluation were bipolar disorder with psychotic features, unspecified anxiety disorder, and chronic PTSD. R. 382. R. 382. Psychotherapy and medication management were prescribed. R. 383. At the April 2017 visit, Plaintiff reported "doing well" with medications, which had no side effects. R. 385. On mental status examination, Plaintiff was oriented, his attention was "[f]ocused," his thought process was goal directed, his behavior was cooperative, and his insight

and judgment were fair. R. 386-87. However, his mood was "[a]ngry, anxious and depressed." R. 386. According to Dr. Gollamudi, Plaintiff's status was "improving." R. 385. In follow-up visits in May and June 2017, Plaintiff continued to complain of depression and anxiety, his mental status examinations remained unchanged, and his status was again characterized as "improving." R. 388-90, 391-93.

In August 2017, Dr. Gollamudi opined, in a report to the Ohio Job and Family Services, that Plaintiff was "Markedly Limited" in most areas of functioning. R. 492. His mental impairments, in Dr. Gollamudi's opinions, render him "unable to engage in any substantial gainful activity." *Id.*

Dr. Gollamudi next saw Plaintiff in November 2017. R. 514-17. He had not been taking medication. R. 514. He complained of depression and anxiety, sleep problems, nightmares, racing thoughts, and auditory and visual hallucinations. *Id.* On mental status examination, Plaintiff was oriented and cooperative, there were no signs of attentional difficulties, his thought process and content were logical and normal, his insight appeared to be normal, his judgment was good, as was his memory for recent and past events. R. 515-16. However, his mood was angry, anxious and depressed; his affect was appropriate, full, and congruent with his mood. R. 516. Diagnoses were bipolar disorder, severe with psychotic features, PTSD, unspecified, and cannabis dependence, uncomplicated. *Id*.

At an August 2018 office visit, Linda Griffin Nsombi, a nurse practitioner, noted that Plaintiff's last visit was in April of that year and that he had returned for medication management. R. 574. His illness was characterized as moderate and chronic. *Id*. On mental status examination, Plaintiff was oriented, easily distracted, cooperative, and restless. *Id*. His speech was pressured, his mood was anxious, and his affect was flat and blunted. R. 574-75. His thought

process was logical and his thought content was normal. R. 575. There were auditory and visual hallucinations. *Id.* Cognition was normal; insight and judgment were fair. *Id*.

At an October 2018 office visit, Nurse Nsombi noted that Plaintiff was oriented and alert, without signs of attentional difficulties, and he was cooperative. R. 518, 560, 571. He was restless and his speech was loud and pressured. *Id.* His mood was euthymic and calm and his affect was appropriate and congruent with his mood. R. 518-19, 560-61, 571-72. His thought process was logical and his thought content was normal; there were no hallucinations. R. 519, 560, 572. His insight and judgment were fair. *Id*.

At an office visit the following month, Plaintiff reported that he was "not good." R. 557, 568. On mental status examination, Plaintiff's mood was angry, anxious and crying; his affect was flat and blunted. R. 558, 568. However, in December 2018, his mood was again euthymic and calm, although his affect was flat. R. 556, 565.

In January 2019, Nurse Nsombi completed a mental impairment questionnaire in which she indicated that she had treated Plaintiff since January 2015 for bipolar disorder, major depressive disorder, PTSD, and anxiety disorder. R. 521. His conditions were manifested by poor memory; oddities of thought, perception, speech, and behavior; sleep disturbance; personality change; mood disturbances; social withdrawal or isolation; emotional lability; delusions or hallucinations; decreased energy; manic syndrome; recurrent panic attacks, obsessive or compulsions; paranoia or inappropriate suspiciousness; generalized persistent anxiety; difficulty thinking or concentrating; and hostility and irritability. *Id.* His ability to understand, remember, or apply one- or two-step instructions was markedly impaired, as were most areas in his ability to concentrate, persist, or maintain pace, and many areas in his ability to adapt or manage himself. R. 522-23. He was markedly impaired in his ability to relate to and work with supervisors, co-

workers, and the public, and to focus attention on work and to persist at a sustained rate. R. 523. According to Nurse Nsombi, Plaintiff would be off task due to his psychological problems 20 % or more of an average work week, and he would be absent from work more than three time a month. R. 521.

In February 2019, Plaintiff reported to Dr. Gollamudi that he was "doing well" and was taking medications, which have no side effects, regularly. R. 562. On mental status examination, Plaintiff was cooperative, his speech was pressured, his mood was euthymic and calm, his affect was flat, his thought process and content were logical and normal, his cognition was normal, and his insight and judgment were fair. R. 563. He reported auditory and visual hallucinations. *Id*.

## V. DISCUSSION

The ALJ exhaustively summarized the medical record and found that Plaintiff had the RFC for a limited range of light work. R. 15-16. Plaintiff contends that, in making this finding, the ALJ erred in evaluating the medical source opinions and medical record in the case. This Court disagrees.

An ALJ must consider all medical opinions in evaluating a claimant's application for benefits. 20 C.F.R. § 416.927(c). Under the regulations applicable to claims filed before March 27, 2017,[5] the opinion of a treating provider must be accorded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is not "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2), (4). The Commissioner must provide "good reasons" for discounting the opinion of a treating provider, and those reasons must both enjoy support in the evidence of record and be sufficiently specific to make clear the weight given to the opinion and the reasons for that weight. *Gayheart*

[5] As noted above, Plaintiff's claim was protectively filed on February 14, 2017.

*v. Comm'r of Soc. Sec*, 710 F.3d 365, 376 (6th Cir. 2013); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (citing Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5).

In the absence of a controlling treating source opinion, the ALJ must consider the following factors in deciding the weight to be given to any medical opinion: the examining relationship, the treatment relationship, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion is with the record as a whole, and other factors that "tend to support or contradict the medical opinion." 20 C.F.R. § 416.927(c)(1)-(6). However, a formulaic recitation of factors is not required. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) ("If the ALJ's opinion permits a claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.").

Plaintiff argues that the ALJ "essentially failed to defer to any of the medical source opinions in the record except perhaps the opinion of consultative psychological examiner," Dr. Sexton, "whose assessment even the state agency reviewing psychologists found 'is not well supported or consistent with other evidence in file' and 'without substantial support from the medical source who made it." *Plaintiff's Statement of Errors*, ECF No. 13, PageID# 640. As a consequence, Plaintiff contends, the ALJ substituted his own lay interpretation of the medical evidence for that of the medical professionals. *Id. See also id.*, at PageID# 643. However, this is not an accurate characterization of either the record or of the ALJ's decision.

**A. Opinions relating to Physical Impairments**

As an initial matter, the Court notes that the ALJ articulated the proper standards governing the evaluation of medical source opinions. R. 26-27. In considering Plaintiff's

physical impairments, the ALJ found that the opinion of Dr. Raab, Plaintiff's treating orthopedic surgeon—who opined that Plaintiff had no limitation in sitting, standing, or walking, but that Plaintiff could not lift or carry weights and was extremely limited in pushing, pulling, and handling—was not entitled to controlling or deferential weight because it was "not fully supported by the record." R. 26. Instead, the ALJ gave only "little weight" to that opinion:

> Dr. Raab's opinion is generally not supported by or consistent with the totality of the evidence of the record, as it was provided while the claimant was still recovering form 2014 wrestling injuries to the right hand and left knee, which improved significantly shortly after Dr. Raab provided his opinion. Throughout the record, the claimant generally presented with relatively good strength in most muscle groups except for the left shoulder in later records, indicating that the claimant was able to perform at lest some lifting and carrying despite Dr. Raab's opinion. Furthermore, despite "not attempting" on his internal medicine consultative examination, his grip strength was nevertheless "pretty good." As such, the record generally does not support Dr. Raab's excessive limitations related to the claimant's right hand injury, which suggested the claimant was unable to lift any weight despite no complaints from his left upper extremity at that time.

R. 26. (citations to the record omitted). In the view of this Court, the ALJ's finding in this regard complied fully with the governing regulation and enjoys substantial support in the record. The ALJ did not commit reversible error in this regard. *See Gayheart,* 710 F.3d at 376; *Rogers,* 486 F.3d at 242.

The ALJ also accorded "little, and not controlling or deferential, weight" to the opinion of Plaintiff's primary care physician, Dr. Nenonene:

> Dr. Nenonene opined the claimant was limited to lifting up to ten pounds, standing and/or walking for a total of two hours in an eight-hour workday for one hour at a time, and sitting for two hours total for one hour at a time. Nevertheless, Dr. Nenonene opined the claimant was capable of performing both sedentary and light work demonstrating a significant internal inconsistency. Dr. Nenonene further opined the claimant was limited to occasional postural activity with limitations in reaching, pushing, and pulling. Dr. Nenonene explained his opinion by noting the claimant's diffuse joint pain and muscle spasms. A month later, Dr. Nenonene changed his opinion to indicate the claimant was unable to perform either light or sedentary work. He did not give an explanation for the change in

> his opinion. Regardless, the sitting, standing, and walking limitations opined by Dr. Nenonene are generally not supported by or consistent with the totality of the evidence in the record. While Dr. Nenonene's notes reflect some physical and mental complaints, his treatment notes generally indicate that his physical examinations were relatively normal, which does not support his excessive limitations. Additionally, evidence from other sources are generally not consistent with Dr. Nenonene's opinion. Throughout the record, the claimant generally presented with relatively good strength in most muscle groups except for the left shoulder in later records, indicating the claimant was able to perform some work activities, particularly with the mostly normal findings in the bilateral lower extremities. Combined with his generally conservative and limited treatment for his physical impairments, Dr. Nenonene's opinion is not consistent with the evidence in the record.

R. 28 (citations to the record omitted). As with Dr. Raab's opinion, the ALJ's assessment of Dr. Nenonene's opinions conformed to the governing regulation and finds substantial support in the record. The Court is therefore without authority to disturb that assessment. *See Gayheart,* 710 F.3d at 376; *Rogers,* 486 F.3d at 242.

Having declined to accord controlling or deferential weight to the opinions of Plaintiff treating physicians, the ALJ went on to consider the other opinions in the record, as required by the regulations. He gave "little weight" to the opinions of the state agency reviewing physicians, who opined that Plaintiff had no severe physical impairments. R. 24. "[T]he record demonstrates that the residuals of his gunshot wound, along with several other impairments, are clearly 'severe' as defined by the Social Security Act, and they require appropriate restrictions in a residual functional capacity." *Id*. The ALJ gave "partial weight" to the opinion of Dr. Oza, the consultative examiner, who opined that Plaintiff could perform sedentary to light work that does not require standing or walking for more than 20 minutes:

> Other evidence in the record supports a reduced range of light work. For example, the claimant frequently presents with relatively good strength in most muscle groups except for his left shoulder, indicating the claimant is able to meet the requirements of light work. As such, the record does not support Dr. Oza's opinion regarding the claimant's ability to stand and walk. . . . Nevertheless, when giving the claimant the full benefit of the doubt with respect to the combined

> effects of his impairments, a reduced range of light work is appropriate, as suggested by Dr. Oza's opinion.

R. 25 (citations to the record omitted). Thus, the ALJ adopted Dr. Oza's opinion except that portion of the opinion that would restrict Plaintiff from standing or walking more than 20 minutes at a time.

Plaintiff argues that, in failing to fully adopt this or any other medical opinion, the ALJ improperly rendered his own lay opinion as to Plaintiff's ability to engage in work-related activities. This Court disagrees.

At the administrative hearing stage, it is the ALJ who is charged with determining the claimant's RFC. 20 C.F.R. § 416.946(c). In making that determination, the ALJ must evaluate all the medical evidence as well as the claimant's testimony. *Webb v. Comm'r of Soc. Sec*. 368 F.3d 629, 632 (6th Cir. 2004) (clarifying *Howard v. Comm'r of Soc. Sec*., 276 F.3d 235 (6th Cir. 2002)); SSR 96-5p, SSR 96-8p. Thus, an ALJ does not improperly assume the role of a medical expert merely by assessing the medical and non-medical evidence when determining a claimant's RFC. *Poe v. Comm'r of Soc. Sec*., 342 F. App'x 149, 157 (6th Cir. 2009). There is no requirement that an ALJ adopt verbatim a medical expert's opinion as to a claimant's ability to engage in work-related activities. *Reeves v. Comm'r of Soc. Sec*., 618 F. App'x 267, 275 (6th Cir. 2015)("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."). Moreover, the ALJ need include in the claimant's RFC only those limitations that the ALJ deems credible. *Casey v. Sec'y of Health & Human Servs*., 987 F.2d 1230, 1235 (6th Cir. 1993). However, the ALJ's RFC determination, like all findings of the ALJ, must be supported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.,* 312 Fed. Appx. 779 (6th Cir. 2009).

In the case presently before this Court, the ALJ properly considered the medical opinions regarding Plaintiff's physical impairments and clearly explained his findings, which enjoy substantial support in the record. Accordingly, this Court will not disturb those findings.

Plaintiff also refers to an April 2019 MRI of Plaintiff's left shoulder, which revealed advanced degenerative changes with bony overgrowth, severe joint space loss, full thickness cartilage loss, labral tear, and complex joint effusion. R. 42-43. Plaintiff explains that, although the MRI was taken prior to the administrative hearing and decision, he was unable to secure the records relating to the MRI for the ALJ's consideration. *Plaintiff's Statement of Errors*, ECF No. 13, at PageID# 644. *See also* R. 49 (Discussion at the administrative hearing regarding Plaintiff's unsuccessful attempts to obtain the test results). Plaintiff characterizes this evidence as both "new" and "material," *Plaintiff's Statement of Errors*, ECF No. 13, at PageID# 645, and argues that the ALJ's RFC determination that Plaintiff can lift up to 20 pounds and use his left upper extremity up to one-third of each workday "is unsupported by the treatment records and the MRI …." *Id.*

A court called upon to review the final decision of the Commissioner under Sentence 4 of 42 U.S.C. § 405(g) is confined to a review of only the ALJ's decision and the evidence presented to the ALJ. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992)). The MRI of Plaintiff's left shoulder was not before the ALJ and this Court may therefore not consider those test results in its review of the ALJ's decision. However, a court may remand the case for further administrative proceedings, pursuant to Sentence 6 of 42 U.S.C. § 405(g), in light of new and material evidence upon a showing of good cause for not presenting that evidence in the prior

proceeding. 42 U.S.C. § 405(g);[6] *Melkonyan v. Sullivan,* 501 U.S. 89, 98 (1991). Evidence is "new," for purposes of this provision, only if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990). Evidence is "material" only if there is "'a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence.'" *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483-84 (6th Cir. 2006)(quoting *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001)). S*ee also Faucher v. Sec'y of Health & Human Servs*., 17 F.3d 171, 174 (6th Cir. 1994). Moreover, a plaintiff must establish good cause for the failure to incorporate the new and material evidence into the prior proceeding. *Bass v. McMahon,* 499 F.3d 506, 513 (6th Cir. 2007); *Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551, 554 (6th Cir. 1984). A plaintiff may do so by demonstrating a reasonable justification for the failure to acquire and present the evidence at the administrative hearing. *Foster,* 279 F.3d at 357.

As the Acting Commissioner notes, *Defendant's Memorandum in Opposition*, ECF No. 14, Plaintiff has not actually requested a remand under Sentence 6 of the statute. Moreover, in light of the ALJ's recognition of "degenerative joint disease of the left shoulder" as among Plaintiff's severe impairments, R. 12, and the ALJ's RFC limiting Plaintiff to only "occasional[ ] use [of] the left upper extremity for overhead reaching," R. 15, Plaintiff has not established that the MRI was material. Put another way, Plaintiff has not established that there is "'a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with'" evidence of the MRI. *See Hollon,* 447 F.3d at 483-84.

---

[6] "The court. . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; . . ."

**B. Opinions relating to Plaintiff's Mental Impairments**

The ALJ also exhaustively considered the evidence relating to Plaintiff's mental impairments. R. 21-22. He accorded "[l]ittle, and not controlling or deferential, weight" to the opinion of Dr. Gollanudi, Plaintiff's treating psychiatrist:

> In May 2017, with only two months of treatment after a significant gap, Dr. Gollamudi opined the claimant had moderate to marked limitations in factors related to a mental residual functional capacity. These findings are not consistent with Dr. Gollamudi's notes from the time he resumed treatment through the time the opinion was provided, as treatment notes reflect that the claimant was "doing well" with medications. The claimant did present with anxious, depressed, and angry moods, but his mental status was otherwise normal with focused attention, average eye contact, and average psychomotor activity. Thought processes were goal directed, his behavior was cooperative, intelligence was estimated to be average, and insight and judgment were fair, as they were on his previous mental status examinations with Dr. Gollamudi. These findings indicate that the claimant had full contact with reality, was cooperative, and had a relative high degree of psychological functioning, which continues throughout the claimant's mental health treatment notes despite substantial issues with noncompliance. The relatively normal findings on the claimant's mental status examination do not support Dr. Gollamudi's excessive limitations, which were not explained. Dr. Gollamudi's opinion is also not consistent with the claimant's performance on his psychological consultative examination or the assessments of DDD reviewing physicians. Because Dr. Gollamudi's opinion is not supported by or consistent with the record, the opinion is afforded little, and not controlling or deferential, weight.

R. 27 (citations to the record omitted). The record unquestionably contains substantial evidence supporting these findings, yet Plaintiff disagrees with this assessment and points to other evidence in the record that reflect other or more serious findings. *Plaintiff's Statement of Errors*, ECF No. 13, PageID# 641. However, because the ALJ's findings enjoy substantial support in the record, this Court must defer to those findings even if there is also substantial evidence that would have supported an opposite conclusion. *See Emard,* 953 F.3d at 849; *Blakley,* 581 F.3d at 406.

The ALJ also accorded "[l]ittle, and not controlling or deferential, weight" to the opinion of Nurse Nsombi, who opined that Plaintiff had moderate to marked limitations, could not engage in full-time work, and would be off task 20% or more of the workday and absent more than three times per month. R. 27. Nurse practitioners are not included in the category of acceptable medical sources. 20 C.F.R. § 416.913(d)(1) (2016). Opinions from those who are not acceptable medical sources "may reflect the source's judgment about some of the same issues addressed in medical opinions from acceptable medical sources." 20 C.F.R. § 416. 927(f)(1). When considering opinions from non-acceptable medical sources, an ALJ may refer to the factors to be considered in evaluating the opinions of acceptable medical sources, *see* 20 C.F.R. § 416. 927(c), but need not refer to every such factor. 20 C.F.R. § 416.927(f)(1).

The ALJ recognized this governing standard, R. 27, and assessed Ms. Nsombi's opinion as follows:

> Ms. Nsombi's opinion is generally not supported by her own treatment notes, which frequently show the claimant's cooperative behavior, good eye contact, normal psychomotor activity, and an euthymic and calm mood. He had logical thought processes, normal thought content, normal cognition, average intelligence, and fair insight and judgment. Additionally, her own notes show that the symptoms were only moderate in nature, which is not consistent with the marked limitations opined by Ms. Nsombi. The relatively normal findings that do not support Ms. Nsombi's excessive and arbitrary restrictions consistently date back to Dr. Gollamudi's treatment records beginning in March 2017, even during periods of noncompliance with medication or after significant gaps in formal mental health treatment. Ms. Nsombi's opinion is also not consistent with the claimant's performance on his psychological consultative examination or the assessments of DDD reviewing physicians.

R. 27 (citations to the record omitted). This assessment is supported by substantial evidence in the record and, as with the ALJ's assessment of Dr. Gollamudi's opinions, this Court must defer to the ALJ's assessment, despite the fact that Plaintiff can point to substantial evidence that

would have supported an opposite conclusion. *See Emard,* 953 F.3d at 849; *Blakley,* 581 F.3d at 406.

Although Plaintiff contends, incorrectly, that the ALJ "failed to defer to any of the medical source opinions in the record except perhaps the opinion of consultative psychological examiner Richard Sexton, Ph.D.," *Plaintiff's Statement of Errors*, ECF No. 13, PageID# 640, the ALJ also gave "partial weight" to the opinions of the state agency reviewing psychologists: "While most restrictions opined by Drs. Edwards and Terry have been incorporated into the residual functional capacity because they are supported by the evidence in the record, the undersigned did not include a restriction that the changes needed to be well explained, as that appears to be a matter of preference [rather] than psychological necessity base[d] on the record." R. 24. The ALJ went on to explain:

> Despite his subjective complaints his performance on his psychological consultative examination and the relatively good functioning reflected in his treatment notes throughout the record demonstrate that the claimant does not experience work-preclusive mental symptoms and limitations. For example, most treatment notes reflect no signs of attentional difficulties and cooperation with good eye contact. He had logical thought processes, normal thought content, normal cognition, average intelligence, and at least fair insight and judgment. When giving the claimant the full benefit of the doubt, these consistently good findings support most limitations opined by Drs. Edwards and Terry, but they do not indicate the need for easily explained changes in workplace routine.

*Id*. (citations to the record omitted). The ALJ also gave "moderate weight" to Dr. Sexton's opinion:

> Dr. Sexton's opinion, which indicates no more than moderate functional deficits is supported by the claimant's performance during the interview and mental status examination. While the claimant demonstrated some difficulties that were consistent with his subjective complaints, the claimant nevertheless adequately completed his tasks. Dr. Sexton's opinion is further supported by evidence from treating providers. For example, most treatment notes reflect no signs of attentional difficulties along with cooperation with good eye contact. He had logical thought process, normal thought content, normal cognition, average intelligence, and at least fair insight and judgment. These repeatedly good

> findings are consistent with Dr. Sextion's opinion when giving the claimant the full benefit of the doubt with respect [to] his subjective complaints. However, despite being supported by the evidence in the record, the undersigned finds the claimant was slightly more limited than opined by Dr. Sexton when giving him the benefit of the doubt.

R. 25 (citation to the record omitted). The ALJ's assessment of all these opinions conformed to the relevant standards, are clearly explained, and find substantial support in the record. The Court is therefore without authority to re-weigh the evidence or to disregard the ALJ's assessment.

## VI. CONCLUSION

For all these reasons, the Court **DENIES** *Plaintiff's Statement of Errors*, ECF No. 13, and **AFFIRMS** the Commissioner's decision.

The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** pursuant to Sentence 4 of 42 U.S.C. § 405(g).

Date: August 15, 2022

*s/Norah McCann King*
NORAH McCANN KING
UNITED STATES MAGISTRATE JUDGE